**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID SMART,** | : | |
| **Plaintiff,** | : | **Case No.  22-cv-5239-KNS** |
| **v.** | : | |
| | : | |
| **MAIN LINE HEALTH,** | : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : | |

## SECOND AMENDED CLASS ACTION COMPLAINT

David Smart ("Plaintiff"), individually and for all others similarly-situated, submits this Second Amended Complaint against Main Line Health ("Main Line Health" or "Defendant"), alleging as follows:

## NATURE OF THE ACTION

1.     American society generally considers communications containing personal medical information to be highly confidential and sensitive, and recognizes that the mishandling of this information can have serious consequences, including invasions of privacy, workplace discrimination, and the denial of insurance coverage.[1]  If people do not believe their personal medical information will be kept private, they are also less likely to seek medical treatment, which can pose serious health consequences.  To maintain public trust in the healthcare system, it is vitally necessary for medical providers to keep electronic communications containing protected health

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (visited Nov. 16, 2022), *https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/* (visited June 12, 2024) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), *https://themarkup.org/pixel-hunt/2022/06/16/ facebook-is-receiving-sensitive-medical-information-from-hospital-websites* (visited June 12, 2024).

information ("PHI") and personally identifiable information ("PII") confidential.

2.      As of June 14, 2024, consistent with all these objectives, Main Line Health's "Website Privacy Policy" promised to keep its patients' protected health information private and not to use, share, or sell this information without patients' written permission:

> We are required by law to maintain the privacy of your health information… [and] make sure that your [protected health information] remains private.
>
> [W]e will seek your written permission prior to using or sharing your information for marketing purposes or selling your information.[2]

3.      Main Line Health did not keep these promises. Unbeknownst to its patients, Defendant embedded Meta Platforms, Inc. ("Meta") advertising tracking tools ("Business Tools") on its website to automatically intercept patients' PHI and PII (collectively, "Private Information") and transmit this Private Information to Meta for commercial purposes without providing any notice, or receiving patients' written consent.

## PARTIES

4.      Main Line Health is a non-profit health system with a corporate office in Radnor, Pennsylvania (Montgomery County) that consists of four acute care hospitals (Lankenau Medical Center, Bryn Mawr Hospital, Paoli Hospital, and Riddle Hospital) and Bryn Mawr Rehabilitation Hospital.  Main Line promotes its website, *www.mainlinehealth.org* (the "Website"), to attract patients, enable their pursuit of medical care, foster its provision of that medical care, support its business, provide avenues for patients to seek medical information and treatment, and provide an avenue to communicate Private Information in pursuit of this education and treatment.

5.      Plaintiff is an adult person who resides in the Commonwealth of Pennsylvania. Plaintiff was a patient of Main Line Health from approximately 2018 to 2022.  During this time,

---

[2] *See https://www.mainlinehealth.org/about/policies/web-privacy-statement* (emphasis added) (visited June 12, 2024).

Plaintiff used the Website to communicate about, facilitate, and inform his medical care and treatment.  Plaintiff used his mobile device and computer to open, maintain, and access an active Facebook account since at least 2018.  On many occasions, most recently in 2022, Plaintiff accessed the Website on his mobile device and computer and used the Website to research conditions and treatments, research providers, look for Defendant's locations close to his address, and schedule medical appointments.  Defendant assisted Meta with intercepting Plaintiff's communications, including those that contained Plaintiff's Private Information and related confidential information, without Plaintiff's knowledge, consent, or express written authorization.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a), because all claims alleged herein form part of the same case or controversy.

7.    This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

8.    This Court has personal jurisdiction over Main Line Health because it operates and maintains its principal place of business in this District.  Further, Maine Line Health regularly conducts business in this District and has made decisions regarding corporate governance, management of the Website, the privacy of users' Private Information, the placement of Meta Business Tools on the Website, and its business relationship with Meta in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Main Line Health does business in, and is subject to, personal jurisdiction in this District. Venue is also proper in this District, because a substantial part of the events or omissions giving rise to the claim occurred in, and emanated from, this District.

## FACTUAL ALLEGATIONS

### Meta's Business Tools: The Meta Pixel And Conversions Application Programming Interface

10.      Meta operates the world's largest social media company and generated $134 billion in revenue in 2023, roughly 97% of which came from selling online advertisements.[3]

11.      In conjunction with its advertising business, Meta encourages and promotes entities and website owners, such as Main line Health, to utilize its "Business Tools" to gather, identify, target and market products and services to their customer/users.

12.      Meta's Business Tools are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

13.      The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[4]

---

[3] Meta Reports Fourth Quarter And Full Year 2021 Results, *https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx#:~:text=For%20the%20full%20year%202023and%20full%20year%202023%2C%20respectively* (visited June 12, 2024).

[4] Facebook, Specifications For Facebook Pixel Standard Events, *https://www.facebook.com/business/help/402791146561655?id=1205376682832142* (visited June 12, 2024); *see* Facebook, Facebook Pixel, Accurate Event Tracking, Advanced, *https://developers.facebook.com/docs/facebook-pixel/advanced/;* Facebook, Best Practices for Facebook Pixel Setup, *https:// www.facebook.com/business/help/218844828315224?id=1205376682832142*; Facebook, App Events API,

14.    Advertisers, such as Main Line Health, can track other user actions and can create their own tracking parameters by building a "custom event."[5]

15.    One of Meta's Business Tools is the Meta Pixel which "tracks the people and type of actions they take" as they interact with a website (or other digital property), including: how long a person spends on a particular web page, which buttons they click, which pages they view, and any text they type in search bars, chat features, text boxes, or otherwise, among other things. [6]

16.    Meta Pixels are customizable and programmable, and the website owner controls the multi-step process to determine which of its web pages contain Pixels and which events on those pages the Pixels track and send to Meta.[7]

17.    By installing Meta Pixels, Main Line Health can effectively plant a "bug" on users' web browsers that instantaneously and surreptitiously duplicates and sends their private, sensitive, confidential, health-related communications on the Website from their browser to Meta's server.

18.    This simultaneous secret transmission contains the original GET request sent to the host website, along with additional data that Meta Pixels are configured to collect. This transmission is initiated by Meta code and concurrent with the communications with the host

---

*https://developers.facebook.com/docs/marketing-api/app-event-api/* (visited June 12, 2024).

[5] Facebook, About Standard And Custom Website Events, *https://www.facebook.com/business /help/964258670337005?id=1205376682832142*; *see also* FACEBOOK, APP EVENTS API, *https://developers.facebook.com/docs/marketing-api/app-event-api/ (*visited May 6, 2024).

[6] Facebook, Retargeting, *https://www.facebook.com/business/goals/retargeting* (visited June 12, 2024).

[7] *Business Help Center: How to set up and install a Meta Pixel*, *https://www. facebook.com/bus iness/help/952192354843755?id=1205376682832142* (visited June 12, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, *https://www.youtube.com/watch ?v=ynTNs5FAUm8* (visited June 12, 2024).

website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the Website—Main Line Health's own code and Meta's embedded code.

19.     Notably, this transmission only occurs on webpages that contain Meta Pixels. Thus, users' Private Information would not be disclosed to Meta but for Main Line Health's decision to install Meta Pixels on the Website.

20.     Instead of taking proactive steps to verify that businesses using Meta Pixels obtain the required consent, Meta uses an "honor system" under which Meta assumes these businesses have "provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."[8]

21.     Defendant also installed and implemented the Meta Conversions Application Programming Interface ("CAPI") on the Website servers.

22.     CAPI is another tracking technology that allows businesses to send web events, such as clicks, form submissions, keystroke events, and other user actions on a website from the website owner's servers to Meta and other third parties.[9]

23.     CAPI is a "server-side" implementation of tracking technology, as opposed to Pixels, which are a "client-side" implementation of tracking technology, meaning that CAPI does not cause users' browsers to transmit information directly to Meta. Instead, CAPI creates a direct, reliable connection that sends marketing data (like website events and off-line conversations) from website host's servers to Meta. In sum, CAPI tracks users' website interactions, including their

---

[8]  *See* Meta Business Tools Terms, *https://www.facebook.com/legal/terms/businesstools* (visited June 12, 2024).

[9] *See https://revealbot.com/blog/facebook-conversions-api/* (visited June 12, 2024). CAPI "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/* (visited June 12, 2024).

Private Information, records and stores this information on the website owner's servers and transmits this data to Meta (or other third parties) from there.[10]

24.    Because CAPI is located on the website owner's servers and is not a bug planted on Users' browsers, it allows website owners like Defendant to circumvent ad blockers or other consent denials by the User that would otherwise prevent Pixels from sending Users' Private Information directly to Meta.

25.    Meta instructs customers like Main Line Health to "[u]se the CAPI in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Main Line Health "to share website events [with Facebook] that the pixel may lose."[11]

26.    Because CAPI is a server-side technology, it cannot access the Facebook c_user cookie to retrieve a user's Facebook ID.[12] Therefore, Meta employs other methods of linking users to their Facebook accounts, described on its developers' website that explains how to de-duplicate data received when both Meta Pixels and CAPI are executed.[13]

---

[10] *https://revealbot.com/blog/facebook-conversions-api/* (visited June 12, 2024). "Server events are linked to a dataset ID and are processed like events sent *via* the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *https://developers.facebook.com/docs/marketing-api/conversions-api* (visited June 12, 2024).

[11] *See https://www.facebook.com/business/help/308855623839366?id=818859032317965* (visited June 12, 2024).

[12] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, e-mail addresses and phone numbers, that we use for matching purposes only." *See https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/* (visited June 12, 2024).

[13] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/con

27.     Meta markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[14]  Meta Pixels and CAPI are, thus, routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles to sell targeted advertisements.

28.     Maine Line Health installed Meta Pixels, CAPI, and other tracking technologies on many (if not all) pages of the Website and programmed or permitted these pages to surreptitiously track, capture, and share users' private and protected communications with Meta, including communications containing patients' Private Information.  The Website would not have disclosed patients' Private Information to Meta but for Main Line Health's decisions to install and implement Meta Pixels and CAPI.

29.     The information Defendant's Tracking Pixel and CAPI sent to Meta includes Private Information patients submit to the Website, for example: their patient status, the type of medical treatments they sought, their health conditions, and information about their physicians and medical appointments. Meta, in turn, sold this Private Information to marketers who target users' Facebook profiles based on this information.  Because of the source of this data and the methods used to collect it, purchasers of this Private Information could reliably link specific users to the medical conditions revealed in their data, providing an economic justification for the targeted advertisements at the heart of this scheme.

---

versions-api/best-practices/ (visited June 12, 2024). *See https://developers.facebook.com/ docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/* (visited June 12, 2024).

[14]  *About Conversions API, https://www.facebook.com/business/help/2041148702652965?id =818859032317965* (visited June 12, 2024).

**Meta's Custom Audiences Tool For Healthcare Partners**

30.     Meta uses the information it receives from Meta Pixels to learn about the visitors to its healthcare partners' websites and leverage that information to sell targeted advertising based on patients' online behavior.  Meta's healthcare partners also use Meta's other ad targeting tools, including tools that involve uploading patient lists to Meta.

31.     When a patient takes an action on a Meta healthcare partner's website embedded with Meta Pixels, the Pixels are triggered to send Meta "Event" data that Meta matches to its users.

32.     A web developer can then use Meta's ad targeting options to create a "Custom Audience" based on Events, send targeted ads to those patients, and use Meta Pixels to measure the effectiveness of this advertising campaign.[15]

33.     Meta also allows Meta healthcare partners to create a Custom Audience by uploading a patient list to Meta. As Meta describes it:[16]

> A Custom Audience made from a customer list is a type of audience you can create to connect with people who have already shown an interest in your business or product. It's made of information - called "identifiers" - you've collected about your customers (such as email, phone number and address) and provided to Meta. Prior to use, Meta hashes this information.
>
> Then, we use a process called matching to match the hashed information with Meta technologies profiles so that you can advertise to your customers on Facebook, Instagram and Meta Audience Network. The more information you can provide, the better the match rate (which means our ability to make the matches). Meta doesn't learn any new identifying information about your customers.

---

[15]  Meta Business Help Center, *About Customer List Custom Audiences* (2024), *https://www.facebook.com/business/help/341425252616329?id=2469097953376494*; *see also,* Meta Blueprint, Connect your data with the Meta Pixel and Conversion API (2024), *https://www.facebookblueprint.com/student/activity/212738?fbclid=IwAR3HPO1d_fnzRCUAhKGYsLqNA-VcLTMr3G_hxxFr3GZC_uFUcymuZopeNVw#/page/5fc6e67d4a46d349e9dff7fa*.

[16] Meta Business Help Center, *About Customer List Custom Audiences* (2024), *https://www.facebook.com/business/help/341425252616329?id=2469097953376494*.

34.    Meta provides detailed instructions for healthcare partners to send their patients' Private Information to Meta through the customer list upload. For example:[17]

> **Prepare your customer list in advance.** To make a Custom Audience from a customer list, you provide us with information about your existing customers and we match this information with Meta profiles. The information on a customer list is known as an "identifier" (such as email, phone number, address) and we use it to help you find the audiences you want your ads to reach.
>
> Your customer list can either be a CSV or TXT file that includes these identifiers. To get the best match rates, use as many identifiers as possible while following our formatting guidelines. You can hover over the identifiers to display the formatting rules and the correct column header. For example, **first name** would appear as **fn** as a column header in your list.
>
> Alternatively, we have a file template you can download to help our system map to your identifiers more easily. (You can upload from Mailchimp as well.)

35.    Meta healthcare partners can then use Custom Audiences derived from their patient list with Meta Pixels and Pixel Events for Meta marketing campaigns and to measure the success of those campaigns.

**Main Line Health's Tracking Technologies Disclosed
Users' Individually-Identifiable Private Information**

36.    Main Line Health uses the Website to encourage patients to book medical appointments, find physicians and treatment facilities, communicate medical symptoms, search medical conditions and treatment options, sign up for events and classes, and more.

37.    Users of the Website ("Users") understandably think they are communicating *only* with their trusted healthcare provider.

38.    However, unbeknownst to Users, Defendant embedded Meta Pixels on the Website that automatically transmit to Facebook every click, keystroke, and detail about their

---

[17] Create a customer list custom audience, *https://www.facebook.com/business/help/1704568431 45568?id=2469097953376494* (visited June 13, 2024).

communications on Defendant's website, including their Private Information.

39. This data is linked to a specific Internet Protocol ("IP") address. Meta Pixels, for example, send information to Facebook through scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

40. IP addresses are considered PHI *even when the individual tied to them does not have an existing relationship with the regulated healthcare entity* because, when a medical provider collects an IP address through its website or mobile app, it reveals that an individual has received, or will receive, health care services or benefits from a medical provider.[18]

41. In addition, if a User is, or has recently, logged into Facebook when they visit a website with Meta Pixels installed, their browser will often attach a third-party cookie, another tracking mechanism that allows Meta to link its pixel data to the User's Facebook account.

42. As Users navigate the Website, it sends their unique, persistent Facebook ID ("FID"), IP addresses and/or device IDs, and all the information they input on the Website to Meta, including their medical searches, treatment requests, the webpages they view, their name, e-mail address, and phone number. While the information captured and disclosed without permission may vary depending on the pixels embedded, these "data packets" can be extensive including, for example, not just the name of the physician and her field of medicine, but also the first name, last name, e-mail address, phone number, zip code, and city of residence entered in forms.

43. A User's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests,

---

[18] *See Use of Online Tracking Technologies by HIPAA*, *supra*, available at *https://www.hhs .gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html* (visited July 9, 2024).

work history, relationship status and other details. Because the User's FID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use a Facebook Profile ID to easily locate, access, and view that User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.[19]

44.    After intercepting and collecting this information, Meta processes it, analyzes it and assimilates it into datasets, such as Core Audiences and Custom Audiences. For Users with Facebook accounts, the information Meta Pixels collect is associated with their FID and Facebook profile, both of which link to their real-world identity.

45.    Meta Pixels even collect Private Information from Users without a Facebook account. Meta maintains "shadow profiles" on Users without Facebook accounts and links the information collected by Meta Pixels to their real-world identity using their shadow profile.[20]

46.    The Private Information Meta Pixels disclose includes information that a specific User is seeking medical care, and the type of medical care sought. Meta then sells this information to marketers who use it to send targeted advertisements to those specific patients online.

47.    Thus, despite professing to be "required by law to maintain the privacy of your health information," and to "make sure that your PHI is kept private,"[21] Main Line Health

---

[19] Pixels force Users to share their FID for easy tracking by the "cookie" Meta stores every time they access their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser;" "cookies help inform websites about the user, enabling the websites to personalize the user experience." *See* *https://www.cloudflare.com/learning/privacy/what-are-cookies/* (visited June 12, 2024).

[20] *See* Russell Brandom, *Shadow Profiles Are the Biggest Flaw In Facebook's Privacy Defense*, (Apr 11, 2018), *https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy* (visited June 12, 2024).

[21] *See* *https://www.mainlinehealth.org/about/policies/web-privacy-statement* (visited June 12, 2024).

affirmatively and intentionally uses Pixels and CAPI to intercept, duplicate, and send Users' Private Information to third parties for marketing purposes without Users' knowledge, consent, or written authorization, putting its own desire for profit over its patients' privacy rights.

48.    Importantly, this information is not "anonymous," because Meta (or any third party that accesses this information) can easily associate the available data with the specific User who provided it.  Nor can Main Line Health reasonably claim the data it shared and used was truly "deidentified" (*i.e.,* not linked to a specific person), because it has not satisfied either of the tests HHS promulgated to establish the deidentification of Private Information.

### How HTTP Requests And Responses, Source Code, And Meta Pixels Enabled Defendant To Share Patients' Private Information

49.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet.  Each "client device" (*e.g.,* computer, tablet, or smartphone) accesses web content through a web browser (*e.g.*, Google Chrome, Mozilla Firefox, Apple Safari, or Microsoft Edge).

50.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet Users' client devices through their web browsers.

51.    Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication sent as a reply to the client device's web browser from the host server in response to an HTTP Request, typically consisting of a web page, another kind of file, text information, error codes, or other data.[22]

52.     A patient's HTTP Request asks the Website to retrieve certain information (*e.g.,* a physician's "Request an Appointment" page), and the HTTP Response renders or loads the Markup, essentially the requested pages, images, words, buttons, or other features that appear on the patient's screen as they navigate a website.

53.     Every website consists of "Markup" and "Source Code."

54.     Source Code is a set of instructions that commands a website visitor's browser to take certain actions when a web page first loads, or when a specified event triggers the code. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the User.

55.     When Users visit the Website by making an HTTP Request to Defendant's server, the server sends an HTTP Response (including the Markup) that displays the webpage visible to the User along with Source Code that includes Main Line Health's Pixel.

56.     Once the Website loads on the User's browser, the downloaded Source Code commandeers the Users' device such that, when the User begins to communicate with Main Line Health on the Website, the Pixels intercept their communications and transmit them to Meta.  Meta

---

[22] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

then uses its own third-party cookies to identify the User, associate their intercepted Personal Information and use this information for commercial purposes, without the Users' knowledge.

57.     With substantial work and technical know-how, an internet user can sometimes circumvent this browser-based wiretap technology, but third parties bent on gathering Private Information, like Meta, implement workarounds like CAPI that creates a direct connection between the web hosts' marketing data and Meta and cannot be evaded even by savvy users.

58.     Thus, communications between patients and Main Line Health on the Website, are received by Main Line Health and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Main Line Health to Meta.

59.     For example, a User who visits the Website and clicks on the "Conditions & Treatments" tab is presented a search bar that provides links to "information about more than 750 specific types of illness, injury and disease to help you understand the different kinds of treatment options and find the right doctor or service for your needs."  A User who clicks on the "Breast Cancer" button is directed to a page, *https://www.mainlinehealth.org/conditions-and-treatments /conditions/breast-cancer*, which includes buttons and links that provide information about specific conditions, treatment options, services, locations, doctors, and clinical trials, each with a separate link. Selecting any of these links, like "Breast Surgery," directs the User to a new page, like *https://www.mainlinehealth.org/specialties/breast-surgery*, providing more information about breast surgeries, treatment options, services, related providers, and locations, many of which have additional links and buttons.

60.     This is just one of the thousands of paths Users can follow on the Website that surreptitiously intercept the "contents" of individuals' communications (*i.e.,* appointment types and dates, physicians, specific button/menu selections, content typed into free text boxes,

demographic information, e-mail addresses, phone numbers and emergency contact information) and their unique identifiers (*i.e.,* IP addresses, FID, cookie identifiers, device identifiers and account numbers) and disclose this information to Meta without Users' knowledge or consent.

**How The Website Disseminates Patient Information**

61.     Users looking for a doctor on the Website, select the "Find a Provider" tab, which leads to the "Find a Doctor" page.



*Figure 1. Defendant directs patients to its "Find a Doctor"*
*webpage with the embedded Pixel, invisible to regular users.*

62.     On this page Defendant asks Users to enter search terms by provider specialty, service line, or condition.

63.     If the User selects filters or enters keywords into the search bar on the "Find a Doctor" webpage, Meta Pixels intercept and transmit these filters and search terms to Meta without

the User's knowledge or consent. Similarly, if the User types in the Website's general search bar or chat, the terms and phrases typed are intercepted and transmitted to Meta, with the User's FID (c_user field), each search filter selected, along with any treatment, procedure, medical condition, or query selected or entered, including the User's Private Information.

64.    After taking any of these actions on the "Find a Doctor" page, the User is subsequently directed to the provider search results page (see below), and their selections or search parameters are automatically transmitted by the Meta Pixels to Meta, along with the User's unique FID.



*Figure 2. Search results for a "female" practicing at the "Bryn Mawr Hospital" as they appear to the user on Defendant's Find a Provider Search results webpage.*

65.    After searching for a breast cancer specialist, the Website brings the User to a page listing Defendant's providers.

66.     Once the User chooses a doctor (*e.g.,* Catherine D. Carruthers), all the information they submit is automatically sent to Meta, including: the User's FID (by the c_user ID cookie), the fact that the User clicked on a specific provider's profile page (*e.g.,* Dr. Carruthers), the User's search parameters (demonstrating they specifically searched for a female doctor and their specialty) and the User's location filter.

67.     If the User decides to schedule an appointment, Defendant communicates to Meta that the User clicked on the "schedule appointment" button from a given provider's webpage and clicked the "Log into MyChart" button that identifiers the User as an existing patient.



*Figure 3. Defendant directs patients to its "Make an Appointment Online Page" from the provider's webpage and allows existing patients to "Log into MyChart."*

68.     Each time Main Line Health sends this activity data, it also discloses the User's PII alongside the contents of their communications.

69.     A User who accesses the Website while logged into Facebook will transmit the c_user cookie to Meta, which contains that User's unencrypted FID.

70.    When accessing the Website, Meta receives several cookies.[23]

| Name | V... | Domain | P. | Expires ... | S |
|------|------|--------|-----|-------------|---|
| datr | Q... | .facebook.com | / | 2024-0... | 2 |
| sb | G... | .facebook.com | / | 2024-0... | 2 |
| c_user | 5... | .facebook.com | / | 2024-0... | 2 |
| dpr | 1.5 | .facebook.com | / | 2023-0... | 6 |
| usida | e... | .facebook.com | / | Session | 7 |
| xs | 7... | .facebook.com | / | 2024-0... | 9 |
| fr | 0... | .facebook.com | / | 2023-0... | 8 |
| presence | E... | .facebook.com | / | 2023-0... | 7 |

*Figure 4.*

71.    When a visitor's browser has recently logged out of an account, Meta compels the

visitor's browser to send a smaller set of cookies[24]:

| fr | 00Zp... | .facebook.com |
|----|---------|---------------|
| wd | 1156... | .facebook.com |
| sb | qqAz... | .facebook.com |
| datr | Malz... | .facebook.com |

*Figure 5.*

72.    The fr cookie contains, at least, an encrypted FID and browser identifier.[25] Meta, at

a minimum, uses the fr cookie to identify Users.[26]

---

[23]  The screenshot below serves as an example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the following image is the _fbp cookie, which is transmitted as a first-party cookie.

[24]  The screenshot below serves as an example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

[25]  Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (visited June 14, 2024). The screenshot below serves as an example and demonstrates the types of data transmitted during an HTTP single communication session.

[26] *Cookies Policy*, FACEBOOK.COM, *https://www.facebook.com/privacy/policies/cookies/* (visited

73.     At each stage, Defendant also utilizes the _fbp cookie, which attaches to a browser as a first-party cookie, and which Meta uses to identify a browser and a User:[27]

74.     The fr and _fbp cookies expire after 90 days unless the visitor's browser logs back into Facebook.[28]  If that happens, the time resets, and another 90 days begins to accrue.

75.     The Meta Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the User is visiting"—*i.e.*, Defendant.[29]

76.     A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Meta.[30]

77.     The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

78.     Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles and sent these identifiers to Meta and other third parties with the associated event data.

---

June 14, 2024).

[27]  *Id.*

[28]  *Id.*

[29]  *First-Party Cookie*, PCMAG.COM, *https://www.pcmag.com/encyclopedia/term/first-party-cookie* (visited June 14, 2024). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[30]  *Third-Party Cookie*, PCMAG.COM, *https://www.pcmag.com/encyclopedia/term/third-party-cookie* (visited June 14, 2024). This is also confirmable by tracking network activity.

**Unique Personal Identifiers, Including IP Addresses, Are PHI**

79.    HIPAA specifically applies to healthcare providers, health insurance providers, and healthcare data clearinghouses.[31]

80.    The HIPAA privacy rule sets forth policies to protect all individually-identifiable health information that is held or transmitted, and there are approximately eighteen HIPAA Identifiers considered to be, or include, PII.  This information can be used to identify, contact, or locate a single person or can be used with other sources to identify a single individual.

81.    These HIPAA Identifiers, as relevant here, include names, dates related to an individual, device identifiers, account numbers, web URLs, IP addresses and unique identifying numbers including the FID.[32]

82.    Main Line Health improperly disclosed its Website Users' HIPAA identifiers, including their names, dates they sought treatments, computer IP addresses, device identifiers, FIDs, and web URLs through its use of the Meta Pixels *in addition to* any services selected, patient statuses, medical conditions, treatments, provider information, and appointment information.

83.    HIPAA further declares information personally-identifiable where a covered entity has "actual knowledge that the information could be used alone or in combination with other

---

[31] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook* (June 21, 2022), *https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook* ("[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (visited June 14, 2024).

[32] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, *https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html* (visited June 14, 2024).

information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

84.     In addition to patient status, medical conditions, treatment, specific providers, appointment information, and patients' FID, Main Line Health's Meta Pixels also improperly disclosed patients' computer IP addresses to Meta.

85.     HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

86.     An IP address is a number that identifies the address of a device connected to the Internet.

87.     IP addresses are used to identify and route communications on the Internet.

88.     IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

89.     Meta tracks every IP address ever associated with a Facebook user.

90.     Meta and other third-party marketing companies track IP addresses for use in tracking and targeting individual homes and their occupants with advertising by using IP addresses.

91.     Main Line Health's disclosure of Website Users' IP addresses violated HIPAA and industry-wide privacy standards.

**Hospital Patients Reasonably Expect Their Health Data To Be Kept Private**

92.     By virtue of Defendant's public statements and dissemination and publication of its Privacy Policy, Website Users are generally aware of Main Line Health's duty of confidentiality with respect to their communication of medical information to it.

93.     Indeed, when Website Users provide their Private Information to Main Line Health, they have a reasonable expectation Main Line Health would not share their Private Information with third parties for commercial purposes unrelated to their medical care.

94.     Privacy polls and studies show an overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

95.     For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[33]

96.     Personal data privacy and obtaining consent to share Private Information are material matters to patients and all consumers.

97.     Website Users' reasonable expectations of privacy in their Private Information are grounded in, among other things, Main Line Health's status as a healthcare provider, Main Line Health's common law obligation to maintain the confidentiality of patients' Private Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Main Line Health's express and implied promises of confidentiality.

---

[33] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), *https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/* (visited June 14, 2024).

**Defendant Violated The HIPAA Privacy Rule**

98.    Main Line Health's disclosure of its patients' Private Information to third parties like Meta violated HIPAA.

99.    Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[34]

100.    Guidance from HHS instructs healthcare providers that patient status alone is protected by HIPAA.

101.    HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is: "created or received by a health care provider;" "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either "identifies the individual;" or "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

102.    The Privacy Rule broadly defines PHI as individually-identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

103.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods

---

[34] *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

and results of the analysis that justify such determination'" or "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

     A.     Names;
                  …
     H.     Medical record numbers;
                  …
     J.     Account numbers;
                  …
     M.     Device identifiers and serial numbers;
     N.     Web Universal Resource Locators (URLs);
     O.     Internet Protocol (IP) address numbers; … and
     P.     Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[35]

104.    The HIPAA Privacy Rule requires any "covered entity," including health care providers, to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

105.    Even the fact that an individual is a patient of a particular entity, or is receiving a medical service from a particular entity, can be PHI.

106.    HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[36]

---

[35] *See* 45 C.F.R. § 160.514.

[36] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*,

107.    Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[37]

108.    Main Line Health provided patient information to third parties in violation of the HHS Privacy Rule (and its own Privacy Policies), because it knowingly "use[d] or cause[d] to be used a unique health identifier; [or] obtain[ed] individually identifiable health information relating to an individual."

109.    A "person… shall be considered to have obtained or disclosed individually identifiable health information… if the information is maintained by a covered entity… and the individual obtained or disclosed such information without authorization."  42 U.S.C. § 1320(d)(6).

110.    Violations of 42 U.S.C. § 1320(d)(6) are subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm."  42 U.S.C. § 1320(d)(6)(b).  In such cases, an entity that knowingly obtains individually-identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both."  *See* 42 U.S.C. § 1320(d)(6)(b)(1).

---

*https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html* (visited June 14, 2024).

[37] *Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index .html* (visited June 14, 2024).

111.    HIPAA also requires Main Line Health to "review and modify the security measures implemented… as needed to continue provision of reasonable and appropriate protection of electronic protected health information," *see* 45 C.F.R. § 164.306(c), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1) – both of which Defendant failed to do.

112.    Under HIPAA, Main Line Health may not disclose PII about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501, 164.508(a)(3), and 164.514(b)(2)(i).

113.    Main Line Health violated other HIPAA safeguard regulations by:

a.    Failing to ensure the confidentiality and integrity of electronic PHI that Main Line Health created, received, maintained, and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c.    Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Main Line Health in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually-identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f.    Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

114.    In disclosing the protected content of its patients' communications, Main Line Health had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions.

115.    Despite willfully and intentionally adding Meta Pixels to the Website and its servers, Main Line Health never informed patients of its intention to disclose their Private Information to Meta, never received signed authorizations from patients allowing it to disclose their Private Information to Meta, and never told patients it shared their Private Information with Meta.[38]

116.    As a result, Defendants' patients do not know it has surreptitiously transmitted Private Information they communicated about their health conditions to Facebook through Meta Pixels on the Website, or that Defendant stored this information on its servers to be transmitted to Meta for targeted advertising and marketing purposes.

117.    Main Line Health's placing third-party tracking codes on the Website is a violation of patients' privacy rights under federal law.  While Plaintiff does not bring a claim under HIPAA itself, Defendant's multiple HIPAA violations clearly demonstrate illegal intent and actions that provide support for Plaintiff's claims.

---

[38]  In contrast, several medical providers that have installed Meta Pixels on their websites have notified their patients of data breaches caused by the Meta Pixels transmitting PHI to third parties. *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach, https://cerebral.com/static/hippa_ privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf* (visited June 12, 2024); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), *https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-reveal ed-pixels-protected-health-information-3* (visited June 12, 2024); *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), h*ttps://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclos ure-of-phi-via-meta-pixel-code-on-patient-portal/* (visited June 12, 2024).

**Defendant Ignored DOH Guidance Against The Use Of Tracking Technologies**

118.    During the relevant period, Main Line Health ignored federal guidance against the use of tracking technologies on healthcare websites.

119.    The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as Meta Pixels, in a limited way, to perform analysis on data key to operations, but may not to use these tools in ways that may expose patients' PHI to vendors.

120.    The OCR Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[39]

121.    The OCR Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as

---

[39] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 18.

expressly permitted or required by the HIPAA Privacy Rule.[40]

122.    The OCR Bulletin did not change any existing rule or impose any new obligation on HIPAA-covered entities.  Instead, it was simply reminded HIPAA-covered entities of their long-standing obligations under guidance and rules in place for decades.  Id. ("[I]t has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").[41]

123.    Main Line Health patients face the same risks that concerns the federal government. Defendant has passed along patients' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining healthcare for certain conditions and where they seek medical treatment.

124.    This information is, as described by the OCR Bulletin, "highly sensitive."  The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or e-mail address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code.[42]

125.    Crucially, this paragraph in the OCR Bulletin continues:

> All such [individually-identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[43]

126.    The OCR Bulletin reminds healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as the Meta Pixels, only in a limited way, to perform analysis on data key to operations and may not use these tools in a way that may expose patients' PHI to these vendors.

127.    Commenting on a June 2022 report discussing the use of Meta Pixels by hospitals and medical centers, David Holtzman, a health privacy consultant, and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated: "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it… It is quite likely a HIPAA violation."[44]

128.    The federal government takes these violations of health data privacy and security seriously, as shown by recent high-profile FTC settlements against several telehealth companies.

129.    The FTC recently imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Meta and Google. The FTC reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Meta and Snapchat for advertising purposes. The FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing

---

[43] *Id.*

[44] ADVISORY BOARD, *'Deeply Troubled'*: Security experts worry about Facebook trackers on hospital sites, *https://www.advisory.com/daily-briefing/2022/06/17/data-trackers* (visited July. 9, 2024).

with Meta, Google and other third parties. Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[45]

130.    In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties.  The letter highlighted the "risks and concerns about the use of technologies, such as Meta Pixels and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."

131.    In stark contrast to the behavior exhibited by Main Line Health, demonstrating that these issues can be properly managed, several medical providers that used Meta Pixels in a similar way provided affirmative, accurate notice to their patients, explaining that their Private Information was being transmitted to third parties.

---

[45] *See* How FTC Enforcement Actions Will Impact Telehealth Data Privacy, *https://health itsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy* (visited July 9, 2024); *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), available at *www.law360.com /articles/1571369/ftc-targets-good rx-in1st-action-under-health-breach-rule?copied=1* ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); *https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-da ta-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-track ing-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc* (visited July 9, 2024);  *https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-healt h-fertility-tracking-app-shared-sensitive-health-data-facebook-google* (visited July 9, 2024).

132.    These actions all provide additional evidence that the data that Defendant chose to disclose is protected Private Information, and that its disclosure of that information violated its patients' HIPAA rights.

**Defendant Violated Its Own Privacy Policy**

133.    During the relevant period, Main Line Health's Patient Privacy Policy provided: "We are required by law to maintain the privacy of your health information," and "make sure that your PHI is kept private."[46]

134.    During the relevant period, Defendant's Patient Privacy Policy represented that "uses and disclosures of PHI… permitted under the laws that apply to us will be made only with your written permission" and "except as… permitted by law, we will seek your written permission prior to using or sharing your information for marketing purposes or selling your information."[47]

135.    During the relevant period, Main Line Health's Patient Rights and Responsibilities Policies represented: "You have the right to… expect all communications and records related to care, including who is paying for your care, to be treated as private" and "have the right to… receive care in a safe setting free from any form of abuse, harassment, and neglect."[48]

136.    During the relevant period, Main Line Health's Web Privacy Statement represented it would "not intentionally share [information concerning a patient's specific medical or health condition] with any third party."[49]

---

[46] *See https://www.mainlinehealth.org/about/policies/patient-privacy-policies* (visited June 14, 2024).

[47] *Id.*

[48] *See* https://www.mainlinehealth.org/patient-services/%20patient-rights-and-responsibilities (visited June 14, 2024).

[49] *See https://www.mainlinehealth.org/about/policies/web-privacy-statement* (visited June 14, 2024).

137.    Defendant violated its own HIPAA Notices and Privacy Policies by unlawfully intercepting and disclosing patients' Private Information to Meta and third parties without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific patients' consent or authorization to share their Private Information.

**Defendant Violated Healthcare Industry Standards**

138.    A medical provider's duty of confidentiality is a cardinal rule embedded in the physician-patient and hospital-patient relationship.

139.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

140.    AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)."

141.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

142.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in

keeping ethics guidelines for confidentiality.[50]

143.    Defendant violated these healthcare industry tenets by unlawfully intercepting and disclosing its patients' Private Information to Meta and third parties without adequately disclosing that Defendant shared Private Information with third parties or acquiring its patients' specific, informed consent or authorization to share their Private Information.

**Patients' Private Information Has Substantial Financial Value**

144.    Patients' Private Information has substantial value, and Main Line Health's disclosure and interception of this information harmed its patients by failing to compensate them for the value of their Private Information and engaging in activities that devalued this information.

145.    Meta "generate[s] substantially all of [its] revenue from selling advertising."[51]

146.    In addition to its own independent marketing programs, Meta also receives billions of dollars of unearned advertising sales revenue from Meta healthcare partners, including Main Line Health, who are targeting Facebook users based on their health information.

147.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

148.    Healthcare data is particularly valuable on the black market because it often contains all an individual's PII and medical conditions, as opposed to the single pieces of information typical of a financial breach.

---

[50] *https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf* (visited June 14, 2024).

[51]    Meta 2023 Annual Report at 7, available at *https://www.annualreports.com/Hosted Data/AnnualReports/PDF/NASDAQ_FB_2023.pdf* (visited July 9, 2024).

149.    Healthcare data is so valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold.  Once it has been detected, it can take years to undo the damage caused.

150.    Courts have repeatedly recognized the value of personal information and the harm that results from unauthorized disclosures.  *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (plaintiffs' allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

151.    The value of health data is well-known and various reports have been conducted to identify its value.  Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations.  The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[52]

152.    Trustwave Global Security published a report entitled The Value of Data.  With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[53]

---

[52]  *See  https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20 Healthcare%20Data.pdf* (visited June 14, 2024).

[53] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (visited June 14, 2024), *citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_ PDF*.

153.    The value of health data has also been reported extensively in the media.  For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[54]

154.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: there's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[55]

155.    The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

156.    These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace.  If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

157.    Meta's and others' practices of using such information to package groups of people as "Lookalike Audiences" and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.  Data harvesting is the fastest growing industry in the nation.

158.    As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

159.    Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.  Overall, the value internet companies derive from

---

[54]    *See https://time.com/4588104/medical-data-industry/* (visited June 14, 2024).

[55]    *See  https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html* (visited June 14, 2024).

Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

160.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user each year.  By 2020, this value jumped to approximately $420, making personal data sales a nearly $140 million industry.[56]  In 2025, the value Internet companies earned from User data is expected to exceed $225 billion.[57]

161.    As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing *https://www.nature.com/articles/s41467-019-10933-3/*) and brazen decisions to release records with identifiable information (citing *https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-reco rds-11579516200?mod=hp_lista_pos3*) are becoming common-place).[58]

162.    Further demonstrating the financial value of patients' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch

---

[56] Medium, How Much Is User Data Worth, March 16, 2020, *https:// pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136* (visited June 14, 2024); Invisibly, How Much Is Your Data Worth? The Complete Breakdown For 2024, July 13, 2021, *https://www.invisibly.com/learn-blog/how-much-is-data-worth/#:~:text=Together%2C%20internet%20advertising%20turned%20%24139.8,back%20of%20your%20personal%20data* (visited June 14, 2024).

[57] Invisibly, Top Industries and Companies That Use Your Data, Aug. 20, 2021, *https://www.invisibly.com/learn-blog/companies-selling-your-personal-data/* (visited June 14, 2024).

[58] *See* National Post, Iris Kulbatski: The Dangers Of Electronic Health Records, February 26, 2020, *https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronichealth-records* (visited June 14, 2024).

deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said *via* phone. "Often, once a day or more."

* * *

[H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[59]

* * *

De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQ*VIA*, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting. But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

163.    Tech companies are also under scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with specific health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[60]

---

[59]   CNBC, Hospital Execs Say They Are Getting Flooded With Requests For Your Health Data, *https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html* (visited June 14, 2024).

[60]   *Id.*

164.    Similarly, in an article titled *How Your Medical Data Fuels A Hidden Multi-Billion Dollar Industry*, Time Magazine referenced the "growth of the big health data bazaar," in which patients' health information is sold, reporting:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[61]

165.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use.  However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data.  For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[62]   These markets are growing more robust as revelations to users diminish information asymmetries and reveal how data can be sold, collected, and used.

166.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

167.    Main Line Health gave away patients' communications and transactions on the Website without permission.

168.    The unauthorized access to patients' personal and Private Information has diminished the value of that information, resulting in harm to Users of the Website.

169.    Plaintiff has a continuing interest in ensuring that his future communications with Main Line Health are protected and safeguarded from future unauthorized disclosure.

---

[61] Time, How Your Medical Data Fuels A Hidden Multi-Billion Dollar Industry, *https://time.com /4588104/medical-data-industry/* (visited June 14, 2024).

[62]  *See 10 Apps for Seling Your Data for* Cash, *https://wallethacks.com/apps-for-selling-your-data/* (visited June 14, 2024).

**Defendant Benefitted From Its Use Of Meta Pixels**

170.    Main Line Health's decision to install Meta Pixels on the Website had a clear economic motive.

171.    In exchange for disclosing the its patients' Private Information, Main Line Health received compensation from Meta in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

172.    After receiving the individually-identifiable Private Information from the Website, Meta forwarded this data, and its analysis of this data, to Main Line Health.  Main Line Health then used this data and analysis for its own commercial purposes that include understanding how Users utilize the Website.

173.    Main Line Health also receives an additional commercial benefit from using Meta's tracking tools, such as Meta Pixels and CAPI, namely being able to serve more targeted advertisements to existing and prospective patients on their Meta accounts such as Facebook and Instagram.

174.    Meta advertises its Pixel as a piece of code "that can help you better understand the *effectiveness of your advertising* and the actions people take on your site."[63]

175.    Main Line Health was advertising its services on Facebook, and the Meta Pixels were used to "help [Main Line Health] understand the success of [its] advertisement efforts on Facebook."[64]

---

[63] *What is the Meta Pixel, https://www.facebook.com/business/tools/meta-pixel* (emphasis added) (visited June 14, 2024).

[64] Infosecurity Magazine, Healthcare Provider Issues Warning After Tracking Pixels Leak Patient Data,    *https://www.infosecurity-magazine.com/news/novant-leak-meta-tracking-pixel/*    (visited June 14, 2024).

176.    Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions.  Retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[65]

177.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Meta through the tracking technologies and the Meta Pixels embedded on, in this case, the Website.  For example, when a User searches for doctors or medical conditions or treatment on the Website, that information is sent to Meta. Meta can then use its data on the User to find more users to click on a Main Line Health ad and ensure that those users targeted are more likely to convert.[66]

178.    Through this process, Meta Pixels load and capture as much data as possible when a User loads a healthcare website that has installed these Pixels.  The information the Meta Pixels capture "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[67]

179.    Patients' Private Information has considerable value because it allows companies to gain insight into their customers, engage in targeted advertising, and boost their revenue.

---

[65]  *The complex world of healthcare retargeting, https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/* (visited June 14, 2024).

[66]  *See, e.g.*, *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), *https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking* (visited June 14, 2024).

[67]  *Id.*

180.    In exchange for disclosing the Private Information of their account holders and patients, Main Line Health is compensated by Meta in the form of enhanced advertising services and more cost-efficient marketing on their platform(s).

## NAMED PLAINTIFF'S EXPERIENCE

181.    As a condition of receiving Main Line Health's services, Plaintiff disclosed his Private Information to Main Line Health on numerous occasions, most recently in 2022.

182.    Plaintiff accessed the Website on his phone and laptop to receive healthcare services from Main Line Health and at Main Line Health's direction.

183.    Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

184.    During the relevant period, when the Defendant's Pixels were present, Plaintiff used the Website to research conditions and treatments, research providers, look for Defendant's locations close to his address, and scheduled doctor's appointments.  The full scope of Main Line Health's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery.  However, Main Line Health intercepted at least the following the following long-URLs, or substantially similar URLs, containing communications about Plaintiff's prospective healthcare and sent them to Meta through the Meta Pixels:

        a.    *https://www.mainlinehealth.org/locations*

        b.    *https://www.mainlinehealth.org/locations?Keyword=haver town*

        c.    *https://www.mainlinehealth.org/locations/family-medicine-in-havertown*

        d.    *https://www.mainlinehealth.org/search#q=Laurence%20D.%20Fine&sort=relevancy*

e.     *https://www.mainlinehealth.org/find-a-doctor/laurence-d-fine*

f.     *https://www.mainlinehealth.org/specialties/neurology*

g.     *https://www.mainlinehealth.org/patient-services/appointments*

h.     *https://my.mainlinehealth.org/MyChart/Authentication/Log in*

i.     *https://www.mainlinehealth.org/search#q=herniated%20disk&sort=relevancy*

j.     *https://www.mainlinehealth.org/conditions-and-treatments/conditions/herniated-disk*

k.     *https://www.mainlinehealth.org/conditions-and-treatments/treatments/non-surgical-orthopaedic-treatments*

l.     *https://www.mainlinehealth.org/search#q=sciatic%20nerve&sort=relevancy*

m.     *https://www.mainlinehealth.org/conditions-and-treatments/conditions/sciatica*

n.     *https://www.mainlinehealth.org/search#q=vertigo&sort=relevancy*

o.     *https://www.mainlinehealth.org/conditions-and-treatments/conditions/balance-disorders-and-dizziness*; and

p.     *https://www.mainlinehealth.org/conditions-and-treatments/treatments/rehab-vestibular-therapy-program.*

185.     At a minimum, these URLs demonstrate that Plaintiff communicated specific Private Information to Main Line Health on the Website, including: his status as a Main Line Health patient, his interest in receiving medical treatment near Havertown, Pennsylvania, his interest in seeing medical practitioners in the fields of family medicine, neurology, and balance disorders, his interest in Dr. Laurence Fine, M.D., his interest in receiving medical treatment for

sciatica, sciatic nerve issues, a herniated disc, and vertigo, his interest in receiving non-surgical orthopedic treatment, and his interest in receiving vestibular therapy rehabilitation.

186.    Contemporaneously with the interception and transmission of Plaintiff's communications on the Website, Main Line Health also disclosed to Meta Plaintiff's personal identifiers, including his IP addresses, FID, cookie identifiers, device identifiers and account numbers.

187.    After communicating Private Information to Main Line Health on the Website, Plaintiff began to receive spam and ads on Facebook related to his medical conditions and treatments, including braces designed to treat sciatica.

188.    Main Line Health never notified Plaintiff that it would share his Private Information with Meta or any other third party for commercial use or gave him any way to opt-out of this practice and Plaintiff never gave his express consent for this use.

189.    Main Line Health never notified Plaintiff that it would put his Private Information to its own commercial use or gave him any way to opt-out of this practice and Plaintiff never gave his express consent for this use.

190.    Plaintiff provided his Private Information to Main Line Health and trusted Main Line Health to safeguard this information according to its policies, and state and federal law.

191.    Plaintiff reasonably expected his communications with Main Line Health on the Website were confidential, solely between himself and Main Line Health, and that none of these communications would be transmitted to, or intercepted by, any third party.

192.    Meta maintains a history of all ads it has shown to Plaintiff, both on and off Meta's social media sites, including on Meta properties and the Facebook Audience Network through which Meta serves ads to Facebook users on non-Meta websites, and Plaintiff intends to seek this

information in discovery to fully inform the scope of his claims and damages.

193.    Plaintiff has a continuing interest in ensuring that his Private Information, which remains backed up in Main Line Health's possession, is protected, and safeguarded from future unauthorized disclosure.

## AFFIRMATIVE TOLLING

194.    The "delayed discovery" rule has tolled any statute of limitations applicable to Plaintiff's claims.  Plaintiff did not know, and had no reasonable basis to know, that Defendant was engaged in intercepting and unlawfully disclosing his Private Information, because Defendant actively endeavored to keep this information secret, including by maintaining publicly-available written policies that concealed its actions.

## CLASS ACTION ALLEGATIONS

195.    Plaintiff brings this action for himself and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3) and 23(c)(4).

196.    Pending additional information received from discovery or further investigation, the Class Plaintiff seeks to represent is presently defined to include:

> All individuals residing in the United States whose Private Information the Meta Business Tools on the Website disclosed to a third party without authorization or consent ("the Class members").

Defendant's officers, directors, and management-level employees and their family members are excluded from the Class, as are the Judge presiding over this case, their court staff, and family members, and all counsel representing either Party.

197.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that Main Line Health's and Meta's business records will

permit the identification of thousands of people meeting the Class definition.

198.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class members, including:

       a.    Whether Main Line Health had a duty to protect and refrain from disclosing the Class members' individually-identifiable health information;

       b.    Whether Main Line Health intentionally disclosed the Class members' individually-identifiable health information to Meta;

       c.    Whether the Class members consented to Main Line Health's disclosure of their individually-identifiable health information to Meta;

       d.    Whether the Class members are entitled to damages because of Main Line Health's conduct; and

       e.    Whether Main Line Health's knowing disclosure of its patients' individually-identifiable health information to Meta is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

199.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because Plaintiff anticipates that Defendant will raise defenses common to the Class.

200.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class members. Plaintiff and the Class members were harmed by the same wrongful conduct perpetrated by Main Line Health that caused their individually-identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class members' claims.

201.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiff will fairly and adequately protect the interests of all the Class members, there are

no known conflicts of interest between Plaintiff and the Class members, and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

202.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class members' ability to protect their interests.

203.    Main Line Health's principal place of business is in Pennsylvania, and is the "nerve center" of its business activities: the place where its high-level officers direct, control and coordinate its activities, including major policy, financial, and legal decisions.

204.    Main Line Health's corporate decisions, and actions (and the resulting legal violations, breaches of duty, and invasions of privacy underlying the allegations in this Complaint) were made in Pennsylvania, and impacted thousands of Pennsylvania residents.

205.    Pennsylvania's courts should resolve the claims belonging to Plaintiff and the Class members, because they have significant interests in regulating the conduct of businesses operating within its borders and protecting the rights and interests of all citizens from illegal conduct perpetrated by a company headquartered, and doing business in, Pennsylvania.

206.    Application of Pennsylvania law to the Class with respect to Plaintiff's and the Class' common law claims is neither arbitrary nor fundamentally unfair because, under choice of law principles applicable to this action, the common law of Pennsylvania applies to the nationwide common law claims of all Class members.  Additionally, given Pennsylvania's significant interest

in regulating the conduct of businesses operating within its borders, and that Pennsylvania has the most significant relationship to Main Line Health, as it is headquartered in Pennsylvania, there is no conflict in applying Pennsylvania law to non-resident consumers such as Plaintiff and Class members.  Alternatively, and/or in addition to Pennsylvania law, the laws set forth below apply to the conduct described herein.

## COUNT I
### Violation Of The Electronic Communications Privacy Act,
### 18 U.S.C. § 2511(1), *et seq.*

207.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

208.    The ECPA prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

209.    The ECPA protects both sending and receipt of communications.

210.    The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

211.    Main Line Health intentionally intercepted electronic communications that Plaintiff and the Class members exchanged with Main Line Health through Meta Pixels installed on the Website.

212.    Transmissions of data between Plaintiff and the Class members and Main Line Health qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

213.    Main Line Health contemporaneously intercepted and transmitted Plaintiff's and the Class members' communications to Meta.

214.    The intercepted communications include:

    a.    the content of Plaintiff's and the Class members' communications relating to appointments with medical providers;

49

b.      the content of Plaintiff's and the Class members' communications related to logging into Main Line Health's MyChart patient portal;

c.      the content of Plaintiff's and the Class members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

d.      Button/menu selections and/or content typed into free text boxes;

e.      Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities; and

f.      Plaintiff's and the Class members' personal identifiers, including their IP addresses, FID, cookie identifiers, device identifiers and account numbers.

215.    For example, Main Line Health's interception of the fact that a patient views a webpage like *https://www.mainlinehealth.org/conditions-and-treatments/treatments/breast-cancer-therapies* involves "content," because it communicates that patient's request for the information on that page.

216.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.      the cookies Main Line Health and Meta use to track Plaintiff's and the Class members' communications;

b.      Plaintiff's and the Class members' browsers;

c.      Plaintiff's and the Class members' computing devices;

d.      Main Line Health's web-servers or webpages where Meta Pixels are present;

e.      Meta's web-servers; and

f.      the Meta Pixels and CAPI source code Main Line Health deploys on the Website to acquire Plaintiff's and the Class members' communications.

217. Meta was not an active party to, or participant in, Plaintiff's and the Class members' communications with Main Line Health.

218. Main Line Health transmitted the content of Plaintiff's and the Class members' communications to Meta through the surreptitious redirection of those communications from Plaintiff's and the Class members' computing devices.

219. Plaintiff and the Class members did not consent to Meta's acquisition of their appointment and treatment communications with Main Line Health.

220. Meta did not obtain legal authorization to obtain Plaintiff's and the Class members' communications with Main Line Health relating to communications with their health entities.

221. Meta did not require Main Line Health to obtain the lawful rights to share the content of Plaintiff's and the Class members' communications relating to appointments and treatments.

222. Any purported consent that Meta received from Main Line Health to obtain the content of Plaintiff's and the Class members' communications was not valid.

223. In disclosing the content of Plaintiff's and the Class members' communications relating to treatments, conditions, and appointments, Main Line Health had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions including:

    a. intentionally committing a tortious act by disclosing individually-identifiable health information without authorization to do so;

    b. intentionally disclosing individually-identifiable health information without authorization and "with intent to sell transfer or use" it for "commercial advantage [or] personal gain" in violation of HIPAA, 42 U.S.C. § 1320d-6;

    c. knowingly intruding upon Plaintiff's and the Class members' seclusion;

d.     intentionally trespassing upon Plaintiff's and the Class members' personal and private property by placing an _fbp cookie associated with the Website on their personal computing devices; and

e.     "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice" in violation of federal wire fraud statutes, 18 U.S.C. § 1343 (fraud by wire, radio, or television) and § 1349 (attempt and conspiracy).

224.    The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; that the defendant did so with the intent to defraud; that it was reasonably foreseeable that interstate wire communications would be used; and that interstate wire communications were in fact used.  The attempt version of the wire fraud statute provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

225.    No party exception in 18 U.S.C. § 2511(2)(d) applies here.  The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Main Line Health violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision imposes a criminal penalty for knowingly disclosing individually-identifiable health information to a third party.

226.    Plaintiff's and the Class members' information that Main Line Health disclosed to third parties qualifies as Private Information, and Main Line Health violated Plaintiff's

52

expectations of privacy, and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Main Line Health intentionally employed wire or electronic communications conveyed by the Meta Pixels and other tracking codes to use Plaintiff's and the Class members' Private Information for its own commercial uses.

227.    Plaintiff and the Class members did not authorize Main Line Health to acquire the content of their communications for purposes of invading Plaintiff's and the Class members' privacy with Meta Pixels. In fact, Plaintiff and the Class members reasonably expected that Main Line Health would not re-direct their communications content to Meta or others attached to their personal identifiers in the absence of their knowledge or consent.

228.    Any purported consent that Main Line Health received from Plaintiff and the Class members was not informed, knowing, or intentional, so cannot be valid.

229.    Main Line Health's scheme or artifice to defraud in this action further consists of:

a.    the false and misleading statements and omissions in its privacy policies set forth above, including the statements and omissions recited in the breach of contract and negligence claims below; and

b.    the placement of the fbp cookie on patient computing devices disguised as a first-party cookie of the Website rather than a third-party cookie from Meta.

230.    Main Line Health acted with the intent to defraud in that it willfully invaded and took Plaintiff's and the Class members' property:

a.    property rights to the confidentiality of their individually-identifiable health information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

b.    property rights to determine who has access to their computing devices.

231.    Main Line Health acted with the intent to defraud in that it willfully invaded and

took Plaintiff's and the Class members' property:

a.    with knowledge that Main Line Health did not have the right
to share such data without written authorization; courts had determined that
a healthcare providers' use of Meta Pixels gave rise to claims for invasion
of privacy and violations of state criminal statutes; a reasonable Facebook
user would not understand that  Meta was collecting their individually-
identifiable health information based on their activities on the Website; "a
reasonable Facebook user would be shocked to realize" the extent of Meta's
collection of individually-identifiable health information; a Covered
Incident had occurred which required a report to be made to the FTC
pursuant to Meta's consent decrees with the FTC; and the subsequent use
of health information for advertising was a further invasion of such property
rights in making their own exclusive use of their individually-identifiable
health information for any purpose not related to the provision of their
healthcare; and

b.    with the intent to: acquire Plaintiff and the Class members'
individually-identifiable health information without their authorization and
without their healthcare providers or covered entities obtaining the right to
share such information; use Plaintiff's and the Class members' individually-
identifiable health information without their authorization; and gain access
to the Plaintiff's and the Class members' personal computing devices
through the fbp cookie disguised as a first-party cookie.

232.    Plaintiff and the Class members have suffered damages because of Main Line

Health's violations of the ECPA that include:

a.    eroding the essential, confidential nature of the provider-
patient relationship;

b.    failing to provide Plaintiff and the Class members with the
full value of the medical services for which they paid, which included a duty
to maintain the confidentiality of their patient information;

c.    deriving valuable benefits from using and sharing the
contents of Plaintiff's and the Class members' communications on the
Website without their knowledge or informed consent, and without
providing any compensation for the information it used or shared;

d.    depriving Plaintiff and the Class members of the value of
their individually-identifiable health information;

     e.      diminishing the value of Plaintiff's and the Class members' property rights in their individually-identifiable health information; and

     f.      violating Plaintiff's and the Class members' privacy rights by sharing their individually-identifiable health information for commercial use.

233.    By intercepting and transmitting Plaintiff's and the Class members' Private Information to Meta for commercial use without notice or consent, Main Line Health acted with a criminal or tortious purpose, subjecting it to all damages available under the ECPA, including equitable and declaratory relief.

## COUNT II
## Negligence

234.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

235.    Plaintiff and the Class members have communicated with Main Line Health through the Website and/or received healthcare services from doctors employed by Main Health.

236.    By virtue of creating and maintaining the Website as a public healthcare resource and its employment relationship with its doctors, Main Line Health assumed a duty to keep confidential all Private Information Plaintiff and the Class members communicate.

237.    Main Line Health assumed a duty to keep Plaintiff's and the Class members' Private Information confidential by issuing Patient Privacy Policies representing that: "We are required by law to maintain the privacy of your health information" and "make sure that your PHI is kept private." *See* Notice of Privacy Practices, *https://www. mainlinehealth.org/about/policies/patient-privacy-policies.*

238.    Main Line Health assumed a duty to keep Plaintiff's and the Class members' Private Information confidential by issuing Patient Privacy Policies representing that: "uses and disclosures of PHI… permitted under the laws that apply to us will be made only with your written

permission" and "except as… permitted by law, we will seek your written permission prior to using or sharing your information for marketing purposes or selling your information." *Id.*

239.    Main Line Health assumed a duty to keep Plaintiff's and the Class members' Private Information confidential by issuing Patient Rights and Responsibilities representing that: "You have the right to… expect all communications and records related to care, including who is paying for your care, to be treated as private" and "have the right to… receive care in a safe setting free from any form of abuse, harassment, and neglect." *See* Patient Rights & Responsibilities, *https://www.mainlinehealth.org/patient-services/patient-rights-and-responsibili ties.*

240.    Main Line Health assumed a duty to keep Plaintiff's and the Class members' Private Information confidential by issuing a Web Privacy Statement representing that it "will not intentionally share [information concerning a patient's specific medical or health condition] with any third party." *See* Web Privacy Statement, *https://www.main linehealth.org/about/policies/web -privacy-statement.*

241.    Main Line Health has a legal duty not to disclose Plaintiff's and the Class members' medical records for marketing purposes without their express written authorization under multiple federal laws. *See, e.g.,* 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

242.    Main Line Health has a legal duty to keep Plaintiff's and the Class members' medical records confidential and private absent express written authorization under Pennsylvania law. *See, e.g.,* 28 Pa. Code § 115.27.

243.    Main Line Health breached its many duties of care by: placing computer code on the Website that intercepts the characteristics and contents of communications about Private Information and automatically transmits this data to Meta; putting this data to its own commercial use; allowing Meta to put this data to its commercial use; failing to provide adequate notice to

Plaintiff and the Class members concerning its collection, transmission, or commercial use of this data; and failing to secure informed consent from Plaintiff and the Class members concerning its collection, transmission, or commercial use of this data.

244.    Plaintiff and the Class members have suffered damages as a direct and proximate result of Main Line Health's breach of its duties of care that include:

> a.    substantial economic benefits and/or revenue Meta provided to Defendant (instead of Plaintiff and the Class members) in return for access to, and use of, Plaintiff's and the Class members' Private Information;

> b.    substantial economic and/or commercial benefits Defendant received from its own access to, and use of, Plaintiff's and the Class members' Private Information without providing compensation to Plaintiff and the Class members;

> c.    failing to receive the full value of medical services from Defendant for which Plaintiff and the Class members paid, which included a duty to maintain the confidentiality of their patient information; and

> d.    having their Private Information exposed by Defendant, which has caused Plaintiff and the Class members to suffer embarrassment, humiliation, emotional harm, and emotional distress.

245.    By sharing Plaintiff's and the Class members' Private Information with Meta in contravention of many duties requiring it to keep such information private, putting this information to its own commercial use without notice or consent, and allowing Meta to put this information to commercial use without notice or consent, Main Line Health proximately caused the damages claimed herein.

## COUNT III
### Invasion Of Privacy – Intrusion Upon Seclusion

246.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

247.    The common-law tort of intrusion protects others from intentionally intruding into a communication or matter as to which another has a reasonable expectation of privacy.

248.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because doctor-patient communications inherently contain details of patients' physical and medical conditions that are universally understood to be personal, private. and deserving of the strictest confidentiality.

249.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because they involved Private Information that Main Line Health was under a legal duty to shield from disclosure.

250.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because Main Line Health's Patient Privacy Policies represents that: "We are required by law to maintain the privacy of your health information" and "make sure that your PHI is kept private." *See* Notice of Privacy Practices, *https://www.mainlinehealth.org/about/policies/patient-privacy-policies.*

251.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because Main Line Health's Patient Privacy Policies represents that: "uses and disclosures of PHI… permitted under the laws that apply to us will be made only with your written permission" and "except as… permitted by law, we will seek your written permission prior to using or sharing your information for marketing purposes or selling your information." *Id.*

252.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because Main Line Health's Patient Rights and Responsibilities represents that: "You have the right to… expect all communications and records related to care, including who is paying for your care, to be treated as private" and "have the right to… receive care in a safe setting free from any form of abuse, harassment, and neglect." *See* Main Line Patient

Rights & Responsibilities, *https://www.mainlinehealth.org/patient-services /patient-rights-and-responsibilities.*

253.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because Main Line Health's Web Privacy Statement representing that it "will not intentionally share [information concerning a patient's specific medical or health condition] with any third party." *See* Web Privacy Statement, *https:// www.main linehealth.org/about/policies/web -privacy-statement.*

254.    Plaintiff and the Class members have a reasonable expectation of privacy in their communications with the Website, because Meta's policies say that businesses using Meta Pixels will not share data that they "know or reasonably should know... includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *See* Meta Business Tools terms, *https://www.facebo ok.com/legal/businesstech?paipv=0&eav=AfaJp5K dIgmsN3DxtBNTRcidnDf6iOfiyPu_u39ri-xvCG3EQzUEuAlF-1K9z uu2i3w&_rdr, at 1(h);* Meta Commercial Terms, *https://www.facebook.com/legal/commercial_terms?paipv=0&eav=AfY63 QNfIYPA_-mBg0oYKxzHOy2vgzIq0rfmEMSelW2UxLa2dLZX3WI WhQTGc8Qf2Yg&_rdr#,* at 3 (using similar language).

255.    Main Line Health intentionally intruded into Plaintiff's and the Class members' private communications on the Website by placing computer code that enabled Meta Pixels to automatically intercept the characteristics and contents of communications about Private Information and transmit this data to Meta.

256.    Main Line Health intentionally intruded into Plaintiff's and the Class members' private communications on the Website by using, and allowing Meta to use, Private Information intercepted from the Website for their own commercial purposes.

257.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person, because it operates a healthcare system founded upon the principle that patients' communications with their healthcare providers must be kept private and confidential so doctors can make fully-informed treatment decisions to provide the most directed, appropriate care.

258.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because the information it intercepted is universally understood to be personal, private, and deserving of confidential treatment.

259.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it violated its own repeated representations about keeping Private Information private, confidential, secure, and protected against unauthorized use without patients' written permission.

260.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it involved intercepting and disclosing the contents of Private Information to Meta, which was not an intended recipient of, or a participant in, these communications.

261.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it did not

provide notice to Plaintiff or the Class members that it would put their Private Information to its own commercial use.

262.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it did not provide notice to Plaintiff or the Class members that it would share their Private Information with Meta, or allow Meta to put this information to commercial use.

263.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it did not receive informed notice or written permission from Plaintiff or the Class members to put their Private Information to its own commercial use.

264.    Main line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because it did not receive informed notice or written permission from Plaintiff or the Class members to share their Private Information with Meta, or allow Meta to put this information to commercial use.

265.    Main Line Health's intentional intrusion into Plaintiff's and the Class members' communications with the Website is highly offensive to a reasonable person because the commercial use of Plaintiff's and the Class members' Private Information provided substantial financial value and/or generated substantial economic benefit for Defendant that it did not share with Plaintiff or the Class members.

266.    Plaintiff and the Class members have suffered damages as a direct and proximate result of Main Line Health's invasion of privacy and intrusion upon their seclusion that include:

> a.    learning that Main Line Health has intruded upon, intercepted, transmitted, shared, and used their Private Information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations,

medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class members to suffer embarrassment, humiliation, emotional harm, and emotional distress;

   b.    substantial economic and/or commercial benefits Defendant received from its own access to, and use of, Plaintiff's and the Class members' Private Information without providing compensation to Plaintiff and the Class members; and

   c.    failing to receive the full value of medical services from Defendant for which Plaintiff and the Class members paid, which included a duty to maintain the confidentiality of their patient information.

267.   By sharing Plaintiff's and the Class members' Private Information with Meta in contravention of many representations that such information would be kept private, putting this information to its own commercial use without notice or consent, and allowing Meta to put this information to commercial use without notice or consent, Main Line Health proximately caused the damages claimed herein.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully asks this Court for an Order:

   a.    Certifying this case as a class action, appointing Plaintiff David Smart as Class Representative, and appointing Stephan Zouras LLC as Class Counsel;

   b.    Entering judgment for Plaintiff and the Class members on their ECPA claim and awarding all damages available under 18 U.S.C. § 2520, including equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs;

   c.    Entering judgment for Plaintiff and the Class members on their negligence claim and awarding all available damages, including the value Main line Health received from selling or licensing Plaintiff's and the Class members' individually-identifiable health information to Meta and/or sharing this information with Meta, and the value Main Line Health received from using Plaintiff's and the Class members' individually-identifiable health information for its own commercial benefit;

   d.    Entering judgment for Plaintiff and the Class members on their intrusion upon seclusion claim and awarding all available damages,

including injunctive relief requiring Main Line Health to cease violating their privacy rights without their knowledge or consent and nominal damages of $100 per violation;

e.      Awarding equitable and injunctive relief to Plaintiff and the Class members that includes an order barring Defendant from any further interception, transmission, or commercial use of Plaintiff's and the Class members' individually-identifiable health information from the Website absent express notice and informed consent;

f.      Awarding equitable and injunctive relief to Plaintiff and the Class members that includes an order requiring Defendant to issue prompt, complete and accurate disclosures to Plaintiff and the Class members describing its use of tracking technology on the Website and seeking informed consent for the use of this technology with respect to each of them and requiring Defendant to use appropriate methods and policies with respect to its consumer data collection, storage, and safety, and fully notify Plaintiff and the Class members about the type of Private Information it discloses to third parties;

g.      Requiring disgorgement of all revenue and economic benefits Defendant wrongfully received because of the wrongful conduct pled herein;

h.      Awarding pre- and post-judgment interest on all damages awarded;

i.      Awarding recovery of Plaintiff's reasonable attorneys' fees and reimbursement of their litigation expenses; and

j.      Awarding such additional relief as justice requires.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

Dated: July 10, 2024

 /s/ *David J. Cohen*
David J. Cohen
**STEPHAN ZOURAS, LLC**
604 Spruce Street
Philadelphia, PA 19106
(215) 873-4836
*dcohen@stephanzouras.com*

Ryan F. Stephan (admitted *pro hac vice*)
James B. Zouras (admitted *pro hac vice*)
Michael Casas (admitted *pro hac vice*)
**STEPHAN ZOURAS, LLP**
222 W. Adams Street, Suite 2020
Chicago, IL 60606
(312) 233-1550
*rstephan@stephanzouras.com*
*jzouras@stephanzouras.com*
*mcasas@stephanzouras.com*

*Attorneys for Plaintiff and the putative Class*